IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| RICHAL ABBOMERATO, | ) | CASE NO. 5:14CV391 |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE SARA LIOI |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Richal Abbomerato ("Abbomerato") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB").  Doc. 1.  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2(b)(1).

For the reasons stated below, the Commissioner's decision should be **AFFIRMED**.

**I. Procedural History**

Abbomerato protectively filed an application for DIB on August 4, 2011, alleging a disability onset date of July 18, 2010.  Tr. 175.  Her insured status for collecting DIB expired on March 31, 2011.  Tr. 38.  Abbomerato alleged disability based on the following: diabetes, rheumatoid arthritis, mitro valve prolapse, spinal stenosis and high blood pressure.  Tr. 179. After denials by the state agency initially (Tr. 113-115) and on reconsideration (Tr. 121-123), Abbomerato requested an administrative hearing.  Tr. 128-129.  A hearing was held before Administrative Law Judge ("ALJ") Paula J. Goodrich on April 23, 2013.  Tr. 54-85.  In her July

1

5, 2013, decision (Tr. 38-47), the ALJ determined that through Abbomerato's date last insured there were jobs that existed in significant numbers in the national economy that she could have performed, i.e., she was not disabled. Tr. 45. Abbomerato requested review of the ALJ's decision by the Appeals Council (Tr. 34) and, on December 18, 2013, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner. Tr. 1-3.

## II. Evidence

### A. Personal and Vocational Evidence

Abbomerato was born in 1955 and was 55 years old on the date her application was filed. Tr. 45. She has at least a high school education and is able to communicate in English. Tr. 45. She has no past relevant work. Tr. 45.

### B. Medical Evidence

#### 1. Medical evidence before Abbomerato's date last insured

**Neck and back:** On December 16, 2002, an x-ray of Abbomerato's cervical spine showed a surgical fusion of the C-4 and C-5 segments, disc space narrowing between the C3-4 and C5-6 segments, a posterior bone spur at C6 narrowing the central canal, and significant bony encroachment of the neural canal at C6-7 on the left. Tr. 216. David C. Radford, a chiropractor, noted that Abbomerato demonstrated loss of flexion and extension on range of motion. Tr. 216.

On December 24, 2002, Abbomerato underwent an MRI of her cervical spine. Tr. 217. The MRI revealed a diffuse concentric bulge at C3-4 causing mild ventral effacement of the subarachnoid space, a mild concentric bulge at C5-6 with mild effacement of the subarachnoid space but with no cord or foraminal encroachment, and a focal asymmetric right paramedian herniation at C6-7 impinging the subarachnoid space but without cord or foraminal encroachment. Tr. 217. A neuroradiology consultation indicated more significant canal stenosis

of C5-6 with mild neural foraminal narrowing on the right and moderate narrowing on the left, a flattened spinal cord and areas of signal abnormality posterior to the C5 vertebral body.  Tr. 218.

On August 17, 2004, Radford evaluated Abbomerato's records and gave his prognosis.[1]  Tr. 219.  He wrote, "given the clinical presentation[,] the objective findings, and aggravation of previously operated cervical spine, I feel the patient's prognosis is poor."  Tr. 219.  Radford noted that the MRI images are consistent with an acute right paracentral disc rupture below the fusion with a poor response to conservative care.  Tr. 219.  He opined that a second surgery is "very likely."  Tr. 219.  Radford remarked that Abbomerato transferred her care to a neurosurgeon on November 7, 2003, and that he had not seen Abbomerato since then.  Tr. 219.

There are no further treatment records related to Abbomerato's neck and back.   On June 15, 2010, Abbomerato saw her physician, Doris Corey, D.O, for a urinary tract infection.  Tr. 268-270.  Upon physical examination, Abbomerato's neck was supple with a normal range of motion.  Tr. 268.  On August 18, 2010, Abbomerato saw Dr. Corey to follow up with her recent diagnosis of Type 2 diabetes (see below).  Tr. 260-61.  Again, Abbomerato's neck was supple and had a normal range of motion.  Tr. 261.  Musculoskeletal findings also indicated a normal range of motion.  Tr. 261.

**Stomach and Esophagous**: On August 6, 2007, Abbomerato had a colonoscopy which revealed a sessile polyp in her cecum and diverticulosis with left-sided colon irritation and internal hemorrhoids.  Tr. 413.  On August 14, 2007, Abbomerato underwent an esophagogastroduodenoscopy ("EGD") procedure that showed linear gastric ulcerations in the body of the stomach, erosive gastritis in the antrum of the stomach and reflux esophagitis.  Tr.

---

[1] Radford stated, "[t]he symptoms described on the last recorded visit remain consistent with the history of the cervical spine injury reported, the objective findings  noted, and outcome assessment tools and pain diagrams are scored."  Tr. 219.

407. A biopsy revealed reactive gastropathy and active gastritis in the stomach and mild active esophagitis consistent with gastroesophageal reflux. Tr. 408.

On July 30, 2008, Abbomerato underwent a second EGD procedure which showed reflux esophagitis with a question of Barrett's esophagus and a small hiatal hernia. Tr. 400. Abbomerato had moderately severe erosive gastritis in the antrum of the stomach and erosive duodenitis. Tr.400. The pathology report following the EGD showed the stomach with mild reactive gastropathy and the esophagus with gastric type mucosa with mild chronic inflammation and focal activity and focal mild active esophagitis consistent with gastroesophageal reflux. Tr. 401.

**Diabetes and heart**: On July 19, 2010, Abbomerato saw Ashwin A. Pai Dhungat, M.D. Tr. 264-265. Abbomerato reported dizziness, back pain and heart palpitations. Tr. 265. On July 23, 2010, she was admitted to the intensive care unit at Marymount Hospital after she initially presented to the emergency room complaining of weakness, fatigue and dizziness and was found to be in atrial fibrillation. Tr. 221. She was started on a Cardizem drip and given an anti-coagulant and beta blockers. Tr. 221. She did well and was quickly transferred out of the intensive care unit. Tr. 221. She was diagnosed with Type 2 diabetes mellitus, atrial fibrillation, essential hypertension, esophageal reflux, coronary atherosclerosis, chronic ischemic heart disease, hyperglyceridemia, hyperlipidemia, mitral valve disorder, angina pectoris, asthma, diaphragmatic hernia and being overweight. Tr. 221-222. She was discharged two days later. Tr. 221.

On August 5, 2010, Abbomerato visited the Diabetes and Endocrine Center of Cleveland complaining of blurred vision. Tr. 488. On August 9, 2010, she visited the center complaining of multiple low blood sugars and blurred vision. Tr. 479. On both occasions she reported that

4

she was exercising for thirty minutes a day and was watching her diet.  Tr. 479.  On December 7, 2010, Abbomerato saw Dr. Corey to follow up on her diabetes diagnosis.  Tr. 255.  She reported that her blood sugars were under control and she denied blurred vision.  Tr. 255.

**Feet**:  During her December 7, 2010, visit with Dr. Corey, Abbomerato complained that her right foot was cold and her third toe on her right foot was painful.  Tr. 255.  She reported that her right calf at times cramped when she walked.  Tr. 255.  Upon physical examination, Abbomerato's right foot was cooler than her left foot, her third toe was "bluish," and there were diminished pulses at the right foot and ankle when compared with her left.  Tr. 256.  Her neck was supple with a full range of motion.  Tr. 256.  Dr. Corey recommended that Abbomerato exercise regularly and continue taking her medication.  Tr. 256.  Dr. Corey diagnosed Abbomerato with unspecified peripheral vascular disease.  Tr. 258.

### 2. Medical evidence after Abbomerato's date last insured

On May 12, 2011, Abbomerato saw Dr. Corey complaining of sinus pressure and ear pain.  Tr. 252-253.  Abbomerato's neck was supple with a normal range of motion.  Tr. 253.

On October 16, 2011, Abbomerato saw Johnny Su, M.D., complaining of joint pain.  Tr. 420.  Upon physical examination, Dr. Su observed Heberden's nodes of the hands, but with no synovitis in the hands, wrists or elbows and good range of motion.  Tr. 426.  Abbomerato's left wrist was tender to palpation.  Tr. 426.   She had parasthesias of the left upper extremity with external and lateral rotation of the neck, trochanteric bursitis tenderness of the left hip with good range of motion in her hips, decreased range of motion of the cervical spine with no tenderness, and myalgias on palpation of the proximal and distal muscle groups in the upper and lower extremities.  Tr. 426.

On October 28, 2011, Abbomerato had a series of x-rays taken. Her hand and wrist x-rays were normal. Tr. 438. Her foot x-rays showed mild midfoot degenerative disease and bilateral hallux valgus deformities. Tr. 440. Her lower back x-ray showed moderate degenerative disc and facet disease throughout her lumbar spine. Tr. 444.

On December 5, 2011, Abbomerato saw Russell C. DeMicco, D.O. Tr. 328. Abbomerato complained of pain in her lower back and left leg. Tr. 326. Upon examination, Abbomerato's range of motion in her back was less than 50%. Tr. 327. She could stand from a seated position but did so gingerly and her gait pattern was slow and deliberate. Tr. 328. She retained normal muscle bulk and tone. Tr. 328. Dr. DeMicco did not recommend surgery or injections—he advised Abbomerato to continue with all normal activities, start an aquatics program, and continue taking her medication. Tr. 328.

On September 19, 2012, Abbomerato saw Dr. Corey, complaining of neck, back and coccyx pain. Tr. 371. Abbomerato's neck was supple with a normal range of motion. Tr. 371. Dr. Corey diagnosed diabetes, coccydynia, and degenerative joint disease of the cervical spine. Tr. 371. On October 9, 2012, Abbomerato returned to Dr. Corey for a follow up visit. Tr. 384-385. Upon examination, Abbomerato had muscle spasms at her cervical, thoracic and lumbar spine, a tender coccyx, and arthritic changes at her hands and feet. Tr. 385.

Dr. Corey completed an assessment of Abbomerato's physical functional capacity. Tr. 322-325. Dr. Corey opined that, due to rheumatoid and degenerative arthritis in her hands, feet, knees, neck and lumbar spine, Abbomerato could lift no greater than five pounds; could stand and walk for only fifteen minutes before needing a rest; and could sit for only ten minutes. Tr. 322-323. She also reported that Abbomerato required frequent breaks. Tr. 322. Dr. Corey

6

commented that Abbomerato had chronic daily pain that was managed with medication, a TENS machine, hot/cold packs and rest. Tr. 325.

On July 16, 2013, Abbomerato had an x-ray taken of her lumbar spine and right foot. Tr. 12. The x-rays showed degenerative disc changes in her lower lumbar spine and a hallux valgus formation in her foot with degenerative changes. Tr. 12. On July 26, 2013, Abbomerato underwent an MRI of her lumbar spine, which showed disc herniations at each lumbar level. Tr. 22-24. Upon examination, Abbomerato had painful straight leg raising and weakness in the right foot. Tr. 25.

### C. Medical Opinion Evidence—State Agency Opinions

On October 13, 2011, Linda Hall, M.D., a state agency physician, reviewed Abbomerato's medical record. Tr. 91-93. Regarding Abbomerato's physical Residual Functional Capacity ("RFC"), Dr. Hall opined that Abbomerato could carry 50 pounds occasionally and 25 pounds frequently; sit for about six hours in an eight-hour day; stand and/or walk for about six hours in an eight-hour day; and avoid concentrated exposure to extreme cold. Tr. 92-93. Dr. Hall noted that Abbomerato takes non-steroidal anti-inflammatory drugs and muscle relaxants and does not complain of any joint pain. Tr. 93. Dr. Hall also observed that there were no abnormal findings reported in Abbomerato's upper extremities and that she had not complained of back pain prior to her date last insured. Tr. 92-93.

On January 10, 2012, state agency physician Anne Prosperi, D.O., reviewed Abbomerato's medical record. Tr. 101-104. Regarding Abbomerato's physical RFC, Dr. Prosperi opined that Abbomerato could carry 50 pounds occasionally and 25 pounds frequently; sit for about six hours in an eight-hour day; and stand and/or walk for about six hours in an eight-hour day. Tr. 102. She also found that Abbomerato could frequently stoop, kneel, crouch,

crawl, climb ramps and stairs; could never climb ladders, ropes, or scaffolds; and should avoid concentrated exposure to extreme cold and all exposure to workplace hazards. Tr. 102-04.

### E. Testimonial Evidence

#### 1. Abbomerato's Testimony

Abbomerato was represented by counsel and testified at the administrative hearing. Tr. 26-48. She testified that she lives with her husband and two children. Tr. 61. At the time of the hearing, her children were ages twelve and eighteen. Tr. 61. Abbomerato testified that she was self-employed as a secretary from 2000 until 2006. Tr. 63.

She testified that she was prevented from working prior to March 2011 due to pain in her bones. Tr. 65. She has a hard time walking, standing, holding up her head, using her hands, and seeing well due to sugar buildup from her diabetes. Tr. 65. Abbomerato had surgery performed on her cervical spine in 2001. Tr. 70. She testified that she has not seen a doctor for her cervical issues since 2003. Tr. 69-70. She also stated that she was having neck pain most of the time prior to March 2011, and that her neck and shoulders would swell. Tr. 73. She had lower back pain all the time prior to March 2011 and her back would frequently go out. Tr. 74. She testified that her hip locks up and prevents her from walking more than five minutes. Tr. 75. She can only sit for ten or fifteen minutes because of the arthritis in her lower back. Tr. 75. For pain, Abbomerato used over-the-counter pain patches and heat. Tr. 75-76.

Abbomerato stated that she has a driver's license but does not drive very often. Tr. 62. She testified that she drives when she has to go the doctor and no one is available to take her, and that she sometimes drives her daughter to school. Tr. 62. She cooks dinner with the help of her daughter and goes grocery shopping with both her daughters. Tr. 65-66. She is "sometimes" able to vacuum, dust and scrub bathrooms. Tr. 66.

### 2. Vocational Expert's Testimony

Vocational Expert Mark Anderson ("VE") testified at the hearing. Tr. 80-83. The ALJ asked the VE to determine whether there was any work that a hypothetical individual with the following characteristics could perform: can occasionally lift and/or carry, including upward pulling, fifty pounds; can frequently lift and/or carry, including upward pulling, twenty-five pounds; can stand and/or walk with normal breaks for about six hours in an eight-hour workday; can sit with normal breaks for about for six hours in an eight-hour workday; can push or pull without limit, except for the aforesaid lift and carry restrictions; can frequently climb ramps and stairs, stoop, kneel, crouch and crawl; can never climb ladders, ropes, and scaffolds; must avoid concentrated exposure to extreme cold and all exposure to hazards such as hazardous machinery and unprotected heights. Tr. 82. The vocational expert testified that such a person could perform jobs as a hand packager (1.5 million national jobs, 94,000 Ohio jobs, 19,000 northeast Ohio jobs), kitchen helper (746,000 national jobs, 25,000 Ohio jobs, 6,000 northeast Ohio jobs), and laundry laborer (420,000 national jobs, 35,000 Ohio jobs, 4,500 northeast Ohio jobs). Tr. 82-83.

### III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Furthermore:

9

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[2] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987). Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the

---

[2] The DIB and SSI regulations cited herein are generally identical. Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq. The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

Commissioner at Step Five to establish whether the claimant has the vocational factors to perform work available in the national economy. *Id.*

### IV. The ALJ's Decision

In her July 5, 2013, decision, the ALJ made the following findings:

1. The claimant last met the insured status requirements of the Social Security Act (the "Act") on March 31, 2011. Tr. 40.

2. The claimant did not engage in substantial gainful activity during the period from her alleged onset date of July 18, 2010 through her date last insured of March 31, 2011. Tr. 40.

3. Through the date last insured, the claimant had the following severe impairments: status-post cervical fusion of the C4 and C5 vertebral bodies (hereinafter "degenerative disc disease of the cervical spine)". Tr. 40.

4. Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. Tr. 42.

5. After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) except that the claimant may frequently stoop, kneel, crouch, crawl, climb ramps and stairs, but may never climb ladders, ropes or scaffolds; the claimant must avoid concentrated exposure to extreme cold and al[l] exposure to workplace hazards, including unprotected heights and dangerous moving machinery. Tr. 43.

6. The claimant has no past relevant work. Tr. 45.

7. The claimant was born on October 15, 1955 and was 55 years old, which is defined as an individual of advanced age, on the date last insured. Tr. 45.

8. The claimant has at least a high school education and is able to communicate in English. Tr. 45.

9. Transferability of job skills is not an issue because the claimant does not have past relevant work. Tr. 45.

11

10. Through the dated last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed. Tr. 45.

11. The claimant was not under a disability, as defined in the Social Security Act, at any time from July 18, 2010, the alleged onset date, through March 31, 2011, the date last insured. Tr. 46.

## V. Parties' Arguments

Abbomerato objects to the ALJ's decision on two grounds. She asserts that the ALJ's credibility assessment is not supported by substantial evidence and that the ALJ failed to consider any evidence after the date last insured. In response, the Commissioner submits that the ALJ reasonably evaluated Abbomerato's credibility assessment and reasonably excluded medical records created after Abbomerato's date last insured.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. 42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health and Human Servs.,* 889 F.2d 679, 681 (6th Cir.1989) (per curiam) (citations omitted)). A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

**A. The ALJ's credibility assessment**

A disability claim can be supported by a claimant's subjective complaints, as long as there is objective medical evidence of the underlying medical condition in the record. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003). "[I]f disabling severity cannot be shown by objective medical evidence alone, the Commissioner will also consider other factors, such as daily activities and the type and dosage of medication taken." *Id.* (citing 20 C.F.R. § 404.1529(c)(3)). To evaluate the credibility of a claimant's subjective reports of pain, a two-part analysis is used. 20 C.F.R. § 416.929(a); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007). First, the ALJ must determine whether the claimant has an underlying medically determinable impairment which could reasonably be expected to produce the claimant's symptoms. *Id.* Second, if such an impairment exists, then the ALJ must evaluate the intensity, persistence and limiting effects of the symptoms on the claimant's ability to work. *Id.* The ALJ should consider the following factors in evaluating a claimant's symptoms:

> 1) the individual's daily activities;
> 2) the location, duration, frequency, and intensity of the individual's pain or other symptoms;
> 3) factors that precipitate and aggravate the symptoms;
> 4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;
> 5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;
> 6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and
> 7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

*Id.*; *see also* 20 C.F.R. §§ 404.1529(c) and 416.929(c); Social Security Rule ("SSR") 96-7p, 1996 WL 374186, *3.

However, "an ALJ is not required to accept a claimant's subjective complaints and may properly consider the credibility of a claimant when making a determination of disability."

13

*Jones*, 336 F.3d at 476 (citations omitted). An ALJ's credibility assessment must be supported by substantial evidence, but "an ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997). It is the province of the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant. *Rogers*, 486 F.3d at 247. If the ALJ rejects a claimant's testimony as not being credible, the ALJ must state her reasons so as to make obvious to the individual and to any subsequent reviewers the weight given to the individual's statements and the reason for that weight. *See Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 733 (N.D. Ohio 2005); Social Security Rule ("SSR") 96-7p, 1996 WL 374186, *2.

     Here, the ALJ undertook the appropriate analysis and determined that Abbomerato's statements about her limitations lacked credibility. Tr. 43-44. In reaching this determination, the ALJ provided several reasons for discounting Abbomerato's credibility, including objective medical records, daily activities, and treatment received, including non-compliance with treatment. Tr. 43-45. *See* SSR 96-7p, 1996 WL 374186, at *3 (credibility analysis should include consideration of, among other things, the objective medical record, the claimant's daily activities, the effectiveness of medication, and treatment received). Specifically, the ALJ observed that an MRI of Abbomerato's cervical spine in 2002 showed diffuse bulging but no canal stenosis or nerve root impingement. Tr. 44, 217. The ALJ noted that physical examinations of Abbomerato "consistently, albeit not universally, reported either minimal or normal findings" of Abbomerato's neck. Tr. 44, 261, 256. The ALJ commented that there was "a sizable gap in treatment for this impairment after release from [Abbomerato's] chiropractor on November 7, 2003," and that the record reveals little treatment overall during the relevant period.

14

Tr. 44.  Regarding daily activities, the ALJ observed that Abbomerato engaged in routine household chores and child rearing, drove a car, attended to her personal hygiene and grooming, and that she exercised daily for a period of thirty minutes.  Tr. 44.  The ALJ noted that Abbomerato followed a regimen of muscle relaxants without reported side effects and that the record also indicated that Abbomerato was non-compliant with treatment recommendations.  Tr. 44.  Although Abbomerato was referred to a neurosurgeon in 2003, she never followed up.  Tr. 44, 219, 70.  She was urged to begin anti-coagulant therapy while hospitalized but refused.  Tr. 44, 226.

Abbomerato asserts that the ALJ "cherry picked" portions of the evidence to fit her conclusion regarding Abbomerato's RFC and distorted Abbomerato's testimony.  Doc. 18, p. 11.  Abbomerato argues that she testified that she could only sometimes engage in household chores, did not drive very often, and did not attend her children's school functions.  Doc. 18, p. 11.  She also asserts that she testified that her daughter helped her cook.  Doc. 18, p. 11.  Nevertheless, it is not "distorting" Abbomerato's testimony to say that Abbomerato did engage in household chores and that she drove a car.  Tr. 61-62, 65-66.  *See White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 284 (6th Cir. 2009) ("[W]e see little indication that the ALJ improperly cherry picked evidence; the same process can be described more neutrally as weighing the evidence.").

Abbomerato also criticizes the ALJ for failing to point out that Abbomerato "used heat, over the counter analgesic patches, Voltaren gel and pain medications to treat her pain and limiting symptoms."  Doc. 18, pp. 11-12.  The failure of the ALJ to mention this treatment is not fatal to her findings.  *See Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. App'x 496, 508 (6th Cir. 2006) ("[a]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (citation omitted).

Finally, Abbomerato contends that even if she could perform the daily activities cited by the ALJ, those activities are not consistent with medium level work activity.  Doc. 18, p. 12.  To the extent Abbomerato is making a separate argument that substantial evidence does not support the ALJ's RFC finding, this argument is without merit.  The ALJ gave significant weight to the opinion of state agency consultant Dr. Prosperi and considerable weight to the opinion of state agency consultant Dr. Hall—both cited liberally to the record and found that Abbomerato could perform work at the medium level with additional limitations.  Tr. 45, 91-93, 101-104.  The ALJ accurately stated, "[n]o other treating or examining physician…or other medical…provider rendered an opinion relevant to the formulation of the [RFC]."  Tr. 45.  Substantial evidence supports the ALJ's findings that Abbomerato can perform medium work with additional limitations.  Furthermore, the ALJ applied the proper factors in making her credibility determination and reasonably concluded that Abbomerato was not entirely credible. The ALJ's reasons are supported by substantial evidence and her opinion should be affirmed.  *See Walters, 127 F.3d at 531* (ALJ's credibility findings are accorded great weight and deference).

### B.  The ALJ properly excluded medical records dated after March 2011

Abbomerato argues that the ALJ improperly failed to consider evidence dated after March 31, 2011, the date last insured.  Doc. 18, p. 12.  She argues that, because evidence after March 2011 shows arthritic and degenerative changes that could only have arisen prior to March 2011, the evidence is relevant and should have been considered.  Doc. 18, p. 13.  Abbomerato states, "the record suggests a gradual onset and worsening of her low back complaints. Thus, the ALJ should have evaluated whether the x-ray evidence of the lumbar spine, imaged just seven months after Ms. Abbomerato's date last insured, supported her subjective allegations of low back pain at that time as well as prior to her date last insured."  Doc. 18, p. 14.

16

"Evidence of disability obtained after the expiration of insured status is generally of little probative value." *Strong v. Soc. Sec. Admin.*, 88 F. App'x 841, 845 (6th Cir. 2004) (citing *Cornett v. Sec'y of Health & Human Servs.*, 869 F.2d 260, 264, n. 6 (6th Cir, 1988)). Medical evidence after the date last insured is relevant only when the evidence "relates back" to the claimant's limitations prior to the date last insured. *Walton v. Astrue*, 773 F.Supp.2d 742, 750 (N.D.Ohio 2011) (citation omitted). The related back evidence:

> is relevant only if it is reflective of a claimant's limitations prior to the date last insured, rather than merely his impairments or condition prior to this date. *See* 20 C.F.R. § 416.945(a)(1) ("Your impairment(s), and any related symptoms, such as pain, may cause physical and mental limitations that affect what you can do in a work setting. Your residual functional capacity is the most you can still do despite your limitations.").

*Id. See also Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) (post-coverage medical evidence is relevant to whether claimant was limited by her condition during the operative time period).

In the instant case, Abbomerato cannot show that any of the medical evidence dated after March 2011 described her condition prior to March 2011. Although Abbomerato argues that the evidence from October 2011 shows arthritic changes "that could not possibly have arisen in the short interval since the date last insured," that is not the standard. Doc. 18, p.13. The standard is whether the later evidence reflects Abbomerato's limitations prior to March 2011. *See Walton*, 773 F.Supp.2d at 750. A "gradual onset and worsening" of lower back complaints after the date last insured is not relevant to Abbomerato's limitations prior to the date last insured. Doc. 18, p. 14. *See Berry v. Astrue*, 2011 WL 5239222, at *5 (S.D.Ohio Aug. 10, 2011) (evidence of worsening back condition in the months after the date last insured properly excluded by ALJ because there was no evidence that back pain resulted in disabling pain before date last insured). Moreover, limitations assessed by Dr. Corey in 2012 do not reflect limitations that Abbomerato faced prior to March 2011. Finally, although Dr. Prosperi noted that Abbomerato complained of

17

back pain once, on July 19, 2010, just prior to her admission to the hospital for her diabetes, Dr. Prosperi also commented that Abbomerato did not complain of back pain after July 2010.  Tr. 104.  Dr. Prosperi further observed that, after July 2010, musculoskeletal examinations were within normal limits, Abbomerato's gait was within normal limits, and that "there were no imaging studies to support the dx of spinal stenosis" prior to the date last insured.  Tr. 104.  Abbomerato has not shown that medical evidence after the date last insured relates back to her limitations prior to that time, and the ALJ, therefore, properly excluded the evidence.  *See Walton*, 773 F.Supp.2d at 750.

### VII. Conclusion and Recommendation

For the reasons set forth herein, the undersigned recommends that the Commissioner's decision be **AFFIRMED**.

Dated: November 14, 2014

                                          Kathleen B. Burke
                                          United States Magistrate Judge

### **OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).